

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-23-00072-CR

———————————————————

MIYUKI RYAN-POYDRAS, Appellant

V.

THE STATE OF TEXAS

On Appeal from County Criminal Court No. 1
Denton County, Texas
Trial Court No. CR-2020-03337-A

Before Sudderth, C.J.; Birdwell and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

A jury convicted Appellant Miyuki Ryan-Poydras of assault–family violence against her then-husband, Travis Poydras.[1] At trial, there was no dispute that the couple had argued on the day in question or that when their argument escalated, Appellant pulled out some of Travis's beard and kicked him. Appellant argued that she had been acting in self-defense, while the State contended that she had been the aggressor. The jury found Appellant guilty.

In three issues, Appellant argues that the trial court erred by denying her motion for mistrial after Travis testified that she had cursed at strangers, that the trial court erred by excluding material evidence from their divorce case and about Travis's propensity to use marijuana, and that there were inconsistent verdicts because both the guilty and the not-guilty verdict forms were signed. We will affirm.

### Background

Travis testified at trial that on March 29, 2020, Appellant became angry because Travis had not adequately cleaned a spot on the carpet where their dog had urinated. Travis described her reaction as "going off." Travis explained, "She was like, Are you f*cking stupid? Like, you don't know how to clean? I told you to blot this up. What the f*ck is wrong with you?" Travis left the house and walked around the block hoping that Appellant would calm down while he was gone. When he returned home,

---

[1]To avoid confusion, we will refer to Ryan-Poydras and Poydras as Appellant and Travis, respectively.

however, Appellant was still angry. When Travis walked in the house, Appellant started "cursing [Travis] out again [and] calling [him] names," and she told Travis "to get [his] stuff and leave." Travis began packing up some belongings, but he could not find his work laptop and headset, which he needed to work the next day, because Appellant had taken them. Travis stated that while he packed his clothes, Appellant grabbed him by the back of the neck and tried to shove him to the ground. She also grabbed his beard and pulled out "chunks of hair" and dug her nails into the back of his neck. Travis then went into the kitchen, where Appellant "start[ed] swinging on [him] and . . . hit [him] in [his] side," which caused him to bend over, at which point she kicked him in the mouth. He also stated that she punched him in the head. Travis called 911; in the call, he described some of Appellant's actions, including pulling out pieces of his beard, but he mainly complained that she would not return his laptop.

Travis also described some incidents in 2018 when Appellant had been physically aggressive with him. Travis said that in one incident, Appellant had grabbed his phone away from him and pushed him with her body, but he suffered no physical injuries. However, she would not let him leave the house, so he called the police. No arrests resulted from that incident. He also described a 2019 incident when Appellant had attempted to choke him. He left the house but did not call the police. Travis further stated that the couple separated in October 2020, about seven months after the assault at issue in this case, and that their divorce was finalized in January 2022.

3

Appellant testified that Travis was the aggressor in the assault that led to her arrest, that she had acted in self-defense, *see* Tex. Penal Code Ann. § 9.31(a) (allowing defendants to raise self-defense as a justification for criminal offenses), and that he had assaulted her on other occasions as well. Appellant explained that on the day of the offense, she became angry because Travis had been smoking marijuana all day when he was supposed to be taking care of their children, so she ordered him to leave the house, which was her separate property. When she began packing up his things, he grabbed her and shook her, and she pulled on his beard in defense. He left the house, but he came back after a while and grabbed her again, which is why she kicked him. Because of a premarital agreement, Travis knew that he would not receive any of her property in a divorce, so he demanded that she give him money and one of her properties.

Lewisville Police Officer Charles Bonar, who had been dispatched in response to Travis's 911 call, testified for the State. Bonar said that when he arrived at the couple's home, Travis "had a busted lip with lacerations still bleeding" and "parts of his beard were on his chest." When Bonar tried to talk to Appellant about what had happened, she was "very upset, pretty hostile[,] and uncooperative with the questions that [he] was asking. Not very forthcoming and pretty aggressive." Bonar asked her what happened multiple times, but "[s]he was very vague. . . [S]he said, I'm not going to get into this right now." After Bonar took Appellant outside, she said that "they had got into an argument and at some point she had kicked [Travis] in the mouth with

4

her right foot." She did not tell Bonar that Travis had grabbed her or shaken her that day, and she also did not say anything to him about Travis smoking marijuana. He did not notice an odor of marijuana in the house. Bonar did not see any bruises or other injuries on Appellant, and she did not complain of any. Bonar determined that Appellant had been the primary aggressor in the situation.

Lewisville police officer David O'Brien testified that he also arrived at the couple's home after Travis's 911 call, and he noticed Travis's bleeding lip and a patch of his beard missing. After talking to Travis, O'Brien walked through the house and saw hair from Travis's beard on the floor. In his conversations with Travis, he saw nothing that pointed to Travis being the aggressor in the couple's fight. He also did not notice any smell of marijuana or any signs of intoxication on Travis.

Another law enforcement officer testified about the 2018 incident when Travis had called the police. The officer stated that when he arrived at the home, Appellant was "not being very cooperative when [he and another officer] were trying to do our investigation" and that she stuck her arm across the door and "would not allow [Travis] to exit the residence" to talk to the officers who responded to the call. The officer said, "You could tell that [Travis] wanted to talk to us, but I don't think he felt comfortable doing it right there next to her." Eventually the officers were able to speak to Travis, who told them that no assault had taken place.

The State also introduced text messages from Appellant calling their dog "a spiteful piece of sh[*]t" for urinating on the carpet and telling Travis to get rid of the

5

dog, as well as texts from 2019 in which she called Travis a "deadbeat f[*]ckin useless husband," insulted his family, and told him to leave. Both parties asked Travis questions about an affidavit that Travis signed soon after the assault in which he said that he was as much at fault in the altercation as Appellant was and that he did not know for sure how his lip had been injured. At trial, Travis stated that those parts of the affidavit were not true.

At the close of the guilt-innocence stage, the trial court submitted its charge to the jury. The "guilty" and "not guilty" verdict forms were on the same page, and the presiding juror signed in the space to indicate a guilty verdict. At the top of the page was a space for the trial court to sign to certify the charge. The trial court signed that page, but not on the line designated to certify the charge. Instead, the trial court signed in the "not guilty" space.[2] The record does not indicate whether the trial court signed the form before the charge was submitted to the jury or after the jury returned its verdict.

After the jury reached a verdict, the trial court read the guilty verdict, asked the presiding juror to confirm that it was the unanimous verdict of the jurors, and asked the parties if there were any reasons for the court not to accept the verdict. The parties did not object to accepting the verdict, and there was no request to poll the jury.

---

[2]A copy of that page of the verdict form (with the presiding juror's signature redacted) is attached to this opinion as an appendix.

6

The trial court assessed Appellant's punishment at confinement in the Denton County Jail for 365 days, probated for twenty months, and a $1,000 fine.

## Discussion

### I. Motion for Mistrial

In her first issue, Appellant argues that the trial court erred by denying her motion for mistrial after Travis testified that she had cursed at strangers. The State counters that the trial court did not abuse its discretion and that any potential error was cured by the trial court's instruction to the jury to disregard the controverted testimony. We agree with the State.

#### A. Background

During his testimony, Travis was asked if, during the early years of their relationship, "without going necessarily into specific instances, were there some traits about [Appellant] that to [him] started to be red flags?" Appellant's attorney objected that the probative value of the testimony was outweighed by its prejudicial effect. The trial court ruled that the State was "allowed to go into the nature of the relationship, as long as [the prosecutor] ke[pt] it . . . very narrow and to the nature of the relationship and not necessarily any prior bad acts." Travis then answered, "Yes, I've seen her curse people out. I've seen her do that to people like contractors as well." The trial court intervened, stating, "Per my ruling, it needs to be regarding their relationship." Appellant's attorney then asked that the jury be instructed to disregard Travis's statement. The trial court granted that request but denied Appellant's follow-

7

up request for a mistrial. Travis then testified about times when Appellant had yelled and cursed at him.

**B. Analysis**

We review the denial of a mistrial motion for abuse of discretion. *Becerra v. State*, 685 S.W.3d 120, 127 (Tex. Crim. App. 2024); *Gomez v. State*, 552 S.W.3d 422, 428 (Tex. App.—Fort Worth 2018, no pet.). Under that standard, we determine whether the trial court's decision was arbitrary or unreasonable. *Becerra*, 685 S.W.3d at 127.

"The remedy of a mistrial is intended for a 'narrow class of highly prejudicial and incurable errors'—those that would render any further expenditure of time and expense in trying the case wasteful and futile." *Gomez*, 552 S.W.3d at 428 (quoting *Wood v. State*, 18 S.W.3d 642, 648 (Tex. Crim. App. 2000)). A mistrial is "'an extreme remedy that should be granted only if residual prejudice remains after less drastic alternatives have been explored.'" *Id.* (quoting *Jenkins v. State*, 493 S.W.3d 583, 612 (Tex. Crim. App. 2016)). To determine whether a trial court should have granted a mistrial, we consider (1) the severity of the misconduct, i.e., the prejudicial effect of the testimony; (2) curative measures, i.e., the efficacy of the trial court's cautionary instruction, if any; and (3) the certainty of conviction absent the misconduct, i.e., the strength of the evidence supporting the conviction. *Rodriguez v. State*, 678 S.W.3d 375, 382 (Tex. App.—Dallas 2023, pet. ref'd); *see also Hawkins v. State*, 135 S.W.3d 72,

77 (Tex. Crim. App. 2004). The considerations overlap with those involved in a harm analysis. *See Hawkins*, 135 S.W.3d at 77.

The trial court instructed the jury to disregard Travis's statement, and the prosecutor never mentioned the testimony afterwards. Travis's one-off comment was not so extreme that any prejudice arising from it was incurable short of a mistrial. Thus, we presume that the jury followed the trial court's instruction. *See Wells v. State*, 558 S.W.3d 661, 670 (Tex. App.—Fort Worth 2017, pet. ref'd); *see also Atterberry v. State*, No. 08-21-00069-CR, 2022 WL 3588108, at *7 (Tex. App.—El Paso Aug. 22, 2022, no pet.) (not designated for publication) (regarding witness testimony about an occurrence when appellant appeared to be on drugs and had sworn at the witness); *Ludwig v. State*, 428 S.W.3d 344, 350 (Tex. App.—Amarillo 2014, no pet.) (noting that "[w]hen the trial court gives a prompt instruction to disregard the testimony at issue, this ordinarily will cure any prejudice arising from the testimony" and that we generally presume that the jury followed the trial court's instructions to disregard).

Moreover, the evidence supporting the conviction was strong. Travis described the events of the evening for the jury, and two police officers who responded to his 911 call also testified, and both said that nothing in their talking with the two or what they saw at the scene led them to believe that Travis was the aggressor. Although Appellant claimed that she had been injured that night and showed the jury pictures

9

of bruises on her arms,[3] the police officers said that they did not see any injuries on her that night, and she did not tell them that she had been injured. The jury also saw text messages between the two in which she repeatedly swore at Travis, called him a failure, and insulted his family and his parenting, and his responses to those texts were calm and conciliatory.

Given the trial evidence, the single statement from Travis about Appellant cursing at third parties would not have substantially affected the trial's outcome. *See Montoya v. State*, No. 05-10-01468-CR, 2012 WL 1059699, at *4 (Tex. App.—Dallas Mar. 30, 2012, no pet.) (mem. op., not designated for publication). We cannot say that the trial court abused its discretion by overruling Appellant's mistrial request. Accordingly, we overrule Appellant's first issue.

---

[3]The State pointed out in questioning Appellant that her pictures did not have time stamps. Appellant's friend Oscar Mendez testified that he took some of the pictures for her after her release from jail the day after the assault. He did not see all of the injuries for which she produced pictures; all he saw on her on that day were some red marks on her arms and hands. Appellant also produced pictures that she claimed showed injuries inflicted by Travis on prior occasions. Oscar testified that he had never seen any injuries on Appellant before and had never heard Appellant complain about abuse by Travis. Travis provided explanations for the alleged previous injuries. For example, Appellant claimed that a picture of swelling to her face was from Travis striking her, but Travis testified that Appellant had been having pain with her teeth, and the State produced text messages showing that she went to the dentist around that time. He also testified that some of the pictures showed injuries that Appellant had sustained in an altercation with her brother and sister-in-law.

## II. Excluded Evidence

In her second issue, Appellant argues that the trial court erred when it did not allow her to enter into evidence the parties' premarital agreement "as well as evidence of [Travis's] alleged drug usage and the accompanying divorce and custody case."

### A. Background

On the morning that trial proceedings began, the State filed a motion in limine addressing, among other things, prior bad acts of any State witness. Appellant agreed to approach before raising the listed topics. Then, after the jury had been selected but before trial began, Appellant's attorney raised the topic of Travis's marijuana use, stating that he planned to talk in his opening statement about Travis's drug use on the day of the altercation. He argued,

> The[ State's] motion in limine—our allegations are that the marijuana—his marijuana use was at issue during the entire marriage. On the date this happened that he was high, that he smoked marijuana continuously that day. So I wanted to—I had that in my opening statement. *It's all part of the same transaction.* So I certainly think it's admissible, but I didn't want to do that without addressing the Court first. [Emphasis added.]

The State objected that evidence on that topic was not admissible under Rule 403. The trial court responded that Appellant could go into the subject "in relation to time or if the door is somehow opened as to that," but that the court felt "like there is a 403 objection to be made there" and "wouldn't use it in [Appellant's] opening statement." Appellant countered that "[i]t has to come out" because "that's the reason why this whole deal started," and although he did not mind approaching the bench

11

before offering such evidence, "it's all part of the same transaction. So . . . under the law[,] it has to come in."

The trial court replied, "[W]ithout getting too much into it—I guess my question is the timing. I don't believe that prior marijuana use—," at which point Appellant interjected, "*I don't care about the prior marijuana use. . . .* I'm talking about the marijuana use *that day.*" [Emphasis added.] He argued,

> We're alleging he assaulted her. . . . She wakes up. She smells marijuana. . . . He is allegedly taking care of the kids. They have an altercation. He leaves, smokes marijuana again, comes back reeking of marijuana, and there's another altercation. And then it's a number of hours later that he calls the police."

The trial court ruled, "I'm going to allow—no prior use of marijuana can come in *at this time*, that there was any alleged use of marijuana prior to [the day of the altercation]. If that was the basis for an argument, then I will allow that."[4] [Emphasis added.] The trial court then asked for confirmation, "[j]ust to be clear," that "the basis of the argument was marijuana use for that day." Appellant's attorney confirmed, "That's correct."

Also on the first day of trial, during cross-examination of Travis, Appellant's attorney attempted to have the couple's premarital agreement admitted, but the trial court sustained the prosecutor's hearsay objection. However, the trial court allowed Appellant to question witnesses about the premarital agreement and the couple's

---

[4]We assume for purposes of this appeal that the trial court's statement was a ruling on admissibility and not a ruling on the State's motion in limine.

divorce. Travis then admitted in questioning that before the parties' marriage, he "didn't own anything, but [Appellant] owned a lot" and that he "would walk away with nothing if [they] got divorced." Travis also acknowledged that in the divorce, he alleged that Appellant had committed assault–family violence because Appellant "was trying to take custody," that he had asked to be appointed as their children's sole managing conservator based on the allegation, and that despite the allegation, the divorce decree had appointed both parents as joint managing conservators.

On the second day of trial, Appellant's attorney changed course and announced that actually, he did care about evidence of Travis's prior drug use for purposes of showing the parties' relationship. He stated that he was "cognizant of [the trial court's] previous ruling about no prior marijuana use prior to the date of the incident in question" and that he wanted to make an offer of proof. For that purpose, he offered Appellant's divorce petition, stating that he "assume[d] that [it] would not be admitted." He then said, "I would just state for the record that we would have liked to have gone into [Travis's] marijuana use previous to [the incident day], to explain the relationship between the parties to the jury, that that's been a big bone of contention between the parties." After the State raised a hearsay objection to the petition, the trial court stated it would be admitted "[f]or these purposes."

The petition alleged that Travis had a "pattern of child neglect[,] including but not limited to drug use," and it asserted that Travis should be required to undergo drug testing and to have supervised visitation of the children unless his drug test was

13

negative. The body of the petition did not include any specific facts about Travis's drug use. However, Appellant's affidavit, attached to the petition as an exhibit, included allegations related to Travis's marijuana use.

Appellant's affidavit asserted that on December 24, 2020, Travis came to stay with her to help take care of their two-year-old twins because Appellant was recovering from knee surgery. When she woke up the next morning, Travis "wreaked [sic] of marijuana" and admitted that he had "smoked several times outside overnight and [that] morning." Appellant was concerned that their children had been affected by secondhand smoke on Travis's clothing because they were in a deep sleep despite having been awake a few hours earlier. Appellant left and went to her parents' house and called 911. She then returned home, by which time the children were awake. The EMTs who arrived told her that there was nothing for them to do because the children were awake and seemed fine and that the EMTs could not do anything "to detect a contact high." A police officer also responded to the call, but he told her that he could not arrest Travis, even after she showed him the marijuana she had found, because his field testing could not distinguish between hemp and marijuana.[5] Appellant's affidavit further stated that in 2013, Travis had "run[-]ins with law enforcement surrounding marijuana"—an arrest for possession, which was in the process of being expunged, and a charge for drug paraphernalia possession.

_____

[5]According to the affidavit, Travis told the officer that he and Appellant both smoked marijuana and had done so that morning, but Appellant denied it.

**B. Analysis**

Appellant complains about the exclusion of the couple's premarital agreement, evidence about the couple's divorce, and evidence about Travis's drug use. She makes two legal arguments: (1) that, in violation of the Confrontation Clause, she was prohibited from cross-examining witnesses to the extent that she could not present a vital defensive theory and (2) that the trial court should have allowed the evidence under Texas Code of Criminal Procedure Article 38.371.

Regarding Appellant's Confrontation Clause argument, she does not tell us where in the record she raised that complaint in the trial court, and our review of the record has not revealed any objection on that basis. Appellant therefore did not preserve her Confrontation Clause argument for appeal. *See Austin v. State*, No. 02-18-00484-CR, 2019 WL 6205247, at *3 (Tex. App.—Fort Worth Nov. 21, 2019, pet. ref'd) (mem. op., not designated for publication). We thus limit our analysis to her complaint about the exclusion of evidence under Article 38.371.

### 1. Divorce Petition and Drug-Use Evidence

Article 38.371 permits a defendant in an assault–family violence case to offer evidence regarding the nature of the relationship between the defendant and the complainant. Tex. Code Crim. Proc. Ann. art. 38.371(a), (b). The article, however, is subject to the rules of evidence. *See id.* art. 38.371(b). Under those rules, to preserve error regarding evidence exclusion, a party must make an offer of proof in question-and-answer form or with a concise statement by counsel unless the substance of the

evidence was apparent from the context. Tex. R. Evid. 103; *Mays v. State*, 285 S.W.3d 884, 889 (Tex. Crim. App. 2009). If the offer is in the form of a statement, it "must include a reasonably specific summary of the evidence offered and must state the relevance of the evidence unless the relevance is apparent, so that the court can determine whether the evidence is relevant and admissible." *Mays*, 285 S.W.3d at 889–90 (quoting *Warner v. State*, 969 S.W.2d 1, 2 (Tex. Crim. App. 1998)).

Appellant argues that she "needed to be able to explain to the jury that her husband had a financial and custodial incentive to blame her for this offense" and that "[t]his was [Travis's] way to ensure he received more money if Appellant were to leave him . . . . By blaming her, he was also able to draw attention away from his drug use, which was at issue in the divorce proceeding," as evidenced by the divorce petition. However, on the trial's first day, not only did Appellant fail to make an offer of proof with respect to Travis's prior drug use, but Appellant's attorney also told the trial court that he did not care about prior-drug-use evidence and only wanted to introduce evidence of Travis's drug use on the day of the assault. The trial court allowed Appellant to introduce the day-of drug-use evidence. Appellant therefore received exactly what she asked for. *See* Tex. R. App. P. 33.1(a)(1); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) (stating that to preserve error, the objecting party must "let the trial judge know what he wants, why he thinks he is entitled to it, and . . . do so clearly enough for the judge to understand him at a time when the judge is in the proper position to do something about it" (quoting *Pena v. State*, 285 S.W.3d 459,

464 (Tex. Crim. App. 2009))). Thus, Appellant has not preserved any appellate complaint to that specific ruling.

However, Appellant again raised the issue of Travis's prior drug use on the trial's second (and final) day when she made her offer of proof. For purposes of this appeal, we will assume that the trial court understood that Appellant's offer was a request for the court to reconsider its prior ruling. *See Mays*, 285 S.W.3d at 890 (stating that one purpose of an offer of proof is "to permit the trial [court] to reconsider [its] ruling in light of the actual evidence"). We will further assume that, by stating that the petition would be admitted for purposes of the offer of proof, the trial court overruled Appellant's request. *See* Tex. R. App. P. 33.1(a); Tex. R. Evid. 103. However, to the extent that Appellant wanted to introduce evidence of Travis's prior drug use other than what was contained in the divorce petition,[6] she did not provide a reasonably specific summary of the evidence offered. Accordingly, she has not preserved error as to the exclusion of any drug-use evidence other than the references in the divorce petition and attached affidavit. *See* Tex. R. Evid. 103; *Mays*, 285 S.W.3d at 891 (concluding that the appellant's summary in his offer of proof, which was made "in the most general and cursory terms, without any of the meat of the actual evidence," did not preserve error).

---

[6]Appellant does not reference any particular part of the petition or affidavit that would have been helpful for the jury to see, but from the argument's context in her brief, we assume that she wanted the jury to see the references to Travis's drug use.

17

As for the divorce petition, Appellant asserts that the evidence would have shown that Travis had a motive to lie about who had assaulted whom in order to improve his position in the divorce. *See* Tex. Code Crim. Proc. Ann. art. 38.371. For purposes of this appeal, we will assume that Appellant made a sufficient offer of proof and that her argument on appeal sufficiently matches her trial court argument.[7] *See Austin*, 2019 WL 6205247, at *3 (stating that party offering evidence must explain why it is needed and noting that the complaint on appeal must match the complaint below). We will further assume that the trial court abused its discretion by excluding this evidence. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000) (applying an abuse of discretion standard to a trial court's exclusion of evidence). Nevertheless, we conclude that Appellant was not harmed by the exclusion.

Because the exclusion of this evidence involves nonconstitutional error, we must disregard it if we have a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect. *See Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021); *cf. Walters v. State*, 247 S.W.3d 204, 222 (Tex. Crim. App. 2007) (holding exclusion of evidence supporting defendant's defensive theory was nonconstitutional error when it did not prevent defendant from presenting a defense). In deciding that question, we consider

---

[7]Appellant asserted in the trial court that the evidence was relevant because it would show that the couple had continual disagreements over Travis's drug use. This argument, like the one on appeal, relates Travis's drug use to an aspect of the couple's relationship. *See* Tex. Code Crim. Proc. Ann. art. 38.371.

(1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Macedo*, 629 S.W.3d at 240; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions; the State's theory, any defensive theories, closing arguments, and voir dire, if applicable. *Haley v. State*, 173 S.W.3d 510, 518–19 (Tex. Crim. App. 2005); *Motilla*, 78 S.W.3d at 355–56.

Because Appellant and Travis both testified, including about what happened on the day of the assault and during other arguments between the couple, the jury was able to consider each person's credibility. Both officers who responded to Travis's 911 call testified that they saw no injuries on Appellant, that she did not complain of any, and that she was uncooperative. The jury saw from her text messages that when she had complaints about Travis's behavior, she became irate and insulting while Travis remained conciliatory and apologetic. If the jury believed Travis and the officers—and they apparently did—then the jury had more than sufficient evidence to find Appellant guilty. *See Motilla*, 78 S.W.3d at 357; *Rideau v. State*, Nos. 09-16-00411-CR, 09-16-00412-CR, 2018 WL 651775, at *9 (Tex. App.—Beaumont Jan. 31, 2018, pet. ref'd) (mem. op., not designated for publication) (holding that exclusion of defensive evidence did not have substantial effect on jury's verdict).

19

Appellant's defense at trial was that because of their premarital agreement, after she became angry about Travis's drug use on the day of the assault and ordered him to leave, Travis grabbed Appellant and demanded that she give him money and one of her properties to make him leave. When she refused, he called the police and blamed her for the assault. The petition did have some relevance to whether Travis was someone who used marijuana, which could support Appellant's testimony that he had done so on the day of the assault and that it started their argument. The petition also would have put before the jury Appellant's contention that Travis had possessed marijuana in 2013 (seven years before the assault) and had also used marijuana approximately nine months after the assault. But this evidence was not particularly strong evidence to show that the couple had continuously fought about his marijuana use during their marriage (Appellant's stated reason for offering the petition at trial), that they had fought about it on the day of the assault, or that Travis might have lied to police about the assault in order to distract a potential future divorce court from his drug use (Appellant's argument on appeal).

Further, even without the petition, Appellant was able to argue to the jury that Travis had a financial and child-custody incentive to blame her for the assault, and she had better evidence than the divorce petition—testimony about the premarital agreement's terms and effect, the divorce proceeding, and its outcome. Additionally, because the trial court had ruled that Appellant could introduce evidence of Travis's

20

day-of drug use, Appellant was not prevented from arguing that they had fought that day about his drug use.

Other parts of the record do not reveal harm. In pretrial argument, when urging the admissibility of the day-of drug-use evidence, Appellant's attorney mentioned that Travis's prior drug use was "a factor in the divorce," but his argument focused on the admissibility of the same-day drug-use evidence and disregarded prior drug-use evidence. Then, in voir dire, Appellant's attorney asserted that a party in a divorce proceeding could benefit financially and in the custody determination if the other party had committed family violence, but nothing in the attorney's voir dire suggested a defensive theory that Travis had lied about an assault to distract a divorce court from his drug use.

Appellant's attorney asserted in his opening statement that the couple's argument started after Appellant woke up and smelled marijuana "reeking from Travis," and that Travis continued to smoke marijuana throughout the day, leading to another argument. He asserted that Appellant acted in self-defense and that Travis blamed the assault on her to get around the premarital agreement, and he emphasized the size difference between Appellant and Travis. This argument tied the assault to the divorce in that it asserted that Travis lied about the assault to get money from Appellant, but it did not tie Travis's drug use to the motive to lie. In closing, the attorney did not mention Travis's drug use that day. As for whether the State emphasized the exclusion of evidence, although the police officers who had

21

responded to the 911 calls said that they had not noticed anything to indicate that Travis had smoked marijuana, in closing, the prosecutor did not mention that testimony or argue the absence of evidence showing that Travis had used drugs.

In summary, although Appellant argued below that Travis had a motive to lie about the assault, she based that contention on the terms of the premarital agreement and did not try to tie the motive to Travis's drug use. Instead, she wanted the drug use evidence to show a source of the argument between Appellant and Travis. Appellant put on testimony about the premarital agreement and the divorce—including testimony from Travis—and the trial court permitted her to put on evidence that the couple had fought that day about Travis's drug use. Moreover, the State did not compound any harm from the exclusion of the evidence by emphasizing the absence of the evidence. *See Lester v. State*, 120 S.W.3d 897, 903 (Tex. App.—Texarkana 2003, no pet.) (holding that harm from exclusion of corroborating witness's testimony was compounded by the State's closing argument referencing the defendant's inability to present a corroborating witness). Reviewing the record as a whole, we conclude that the exclusion of the divorce petition and its allegations about Travis's drug use did not have a substantial or injurious effect on the jury's verdict and did not affect Appellant's substantial rights. *See King v. State*, 953 S.W.2d 266, 271–73 (Tex. Crim. App. 1997). Accordingly, we overrule Appellant's second issue.

## 2. Other Excluded Evidence

Aside from evidence of Travis's drug use, Appellant also argues that she "had a strong interest in being able to explore the divorce and premarital agreements[8] through direct and cross-examination of the witnesses." She has not presented reversible error.

Regarding the premarital agreement, although the trial court excluded the agreement itself as hearsay, Appellant does not argue on appeal that the agreement was not hearsay. *See* Tex. R. App. P. 38.1(i). Further, the trial court allowed Appellant to ask witnesses about the agreement, and she does not explain what evidence from the premarital agreement she was prevented from putting before the jury. Accordingly, her argument regarding the premarital agreement is inadequately briefed. *See id.* Additionally, Appellant elicited testimony from Travis about the agreement, including his admission that he "didn't own anything, but [Appellant] owned a lot," and that under that agreement, he would not receive in a divorce any property that Appellant owned prior to the marriage. Given the record as discussed above and the fact that Appellant was allowed to elicit testimony about the premarital agreement and its effect, even if the agreement's exclusion was an abuse of discretion, the exclusion

---

[8]The record does not contain a divorce agreement or more than one premarital agreement, either in the trial exhibits or in the exhibits offered by Appellant in her offer of proof. We assume by "the divorce and premarital agreements," Appellant meant the premarital agreement and either the circumstances of the divorce or pleadings in the divorce case.

would have had a minimal effect, if any, on the jury's verdict. Thus, we must disregard it. *See King*, 953 S.W.2d at 271–73.

As for exploring the divorce, aside from the copy of Appellant's divorce petition, she does not tell us what evidence related to the divorce that she was prevented from presenting to the jury. Thus, to the extent her argument refers to any other evidence about the divorce, the argument is inadequately briefed. S*ee* Tex. R. App. P. 38.1(i). Additionally, the record does not support her assertion that she was prevented from presenting evidence about the divorce. Appellant was allowed to ask Travis questions about the divorce proceeding, including the fact that, although Travis had "brought up the assault family violence" in the proceeding and asked for sole custody of their children, Appellant was appointed joint managing conservator, and the two parents share custody. We overrule the remainder of her second issue.

## III. Verdict Form

In her third issue, Appellant argues that the jury's verdict is inconsistent since both the guilty and not-guilty forms are signed. The State argues in response that although the trial court improperly certified the jury charge, the verdict was not inconsistent, Appellant suffered no harm, and any complaint was waived because Appellant did not request that the jury be polled. We agree with the State.

Because Appellant did not object to the charge, we reverse only if the complained-of charge error resulted in egregious harm. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App.

24

1985) (op. on reh'g); *see* Tex. Code Crim. Proc. Ann. art. 36.19. In making an egregious-harm determination, we must consider "the actual degree of harm . . . in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel[,] and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. *See generally Gelinas v. State*, 398 S.W.3d 703, 708–10 (Tex. Crim. App. 2013). The purpose of this review is to illuminate the actual, not just theoretical, harm to the accused. *Almanza*, 686 S.W.2d at 174.

The trial court did not sign the charge in the place designated to certify the charge, and the record does not reveal when the trial court signed the charge or why the court signed in the wrong place. When a trial court certifies a charge, but the record does not affirmatively show when the trial court signed the charge and the matter is not disputed in the trial court, we must presume that the trial court certified the charge before the charge was read to the jury. *See* Tex. R. App. P. 44.2. However, in this case, regardless of whether the jury received a charge that was not certified or that was certified but with a misplaced trial court signature, the record does not support reversal.

The trial court read the charge to the jury, and no party disputes that the charge read by the trial court was the same charge given to the jury. Unlike other parts of the charge, the trial court's signature (or lack thereof) did not provide a lens through which the jury was to evaluate the evidence. *See Alcoser v. State*, 663 S.W.3d 160,

25

165 (Tex. Crim. App. 2022) (describing the parts of the jury charge and stating that the charge must inform the jury of the circumstances under which it must convict or must acquit). The other parts of the charge instructed the jury regarding the elements of assault and provided the relevant definitions, including "bodily injury" and "family." The application paragraph applied those concepts to this case's facts as alleged in the information and instructed the jury to find Appellant guilty if it found that she had intentionally, knowingly, or recklessly caused bodily injury to Travis, a member of her family, by striking, grabbing, or scratching him with her hand or by kicking him with her foot. The trial court's signature (or lack thereof) to certify the charge had no bearing on the charge's instructions. This factor weighs against harm.

As for the state of the evidence, we summarized above the evidence from both parties regarding Appellant's guilt or innocence, and that evidence was sufficient for the jury to find Appellant guilty. *See Arrington v. State*, 451 S.W.3d 834, 841 (Tex. Crim. App. 2015) (noting that under *Almanza*, "we look to the state of the evidence to determine whether the evidence made it more or less likely that the jury charge caused appellant actual harm"). The trial court's certification or lack thereof did not negate that evidence or prevent the jury from considering it. This factor weighs against harm.

The remaining factors also weigh against harm. No argument by either party drew attention to the way that the trial court had certified (or had failed to certify) the charge or asked the jury to put any particular weight on it. After the jury returned its verdict, the foreperson confirmed that the jury had unanimously found Appellant

26

guilty. There is no indication in the record that a missing or misplaced trial court signature affected the jury's verdict. Considering all the *Almanza* factors, we conclude that no harm resulted from the charge's submission to the jury with either a missing or misplaced signature. *See Nolan v. State*, 39 S.W.3d 697, 698 (Tex. App.—Houston [1st Dist.] 2001, no pet.).

Appellant, however, contends that the trial court's signature means that there are two inconsistent verdicts in the case. She argues that by signing in the not-guilty space, "[i]n essence, the trial court found Appellant Not Guilty of the charged offense." We disagree. Appellant opted to have a jury trial on her guilt or innocence, the trial court clearly intended to have the jury decide the matter—it submitted the charge to the jury and accepted the jury's guilty verdict—and the jury charge itself gave the task to the jury. The trial court asked the parties whether there was any reason not to accept the jury's verdict, and the trial court's judgment reflects that it was rendered on the jury's verdict. Nothing in the record supports a conclusion that the trial court intended its signature to constitute a not-guilty finding. Thus, we do not have two inconsistent verdicts; we have one verdict—by the jury—of guilty.

Appellant further argues that "[i]t is possible that the jury foreman signed the Guilty verdict form simply because there was no available signature line on the verdict form, as the trial court had already signed that option. There is simply no way to tell." Appellant's argument assumes that the jury might have found her not guilty, but rather than sending a note to the trial court asking for clarification about its signature,

signing next to the trial court's signature, or signing anywhere else under the "Not Guilty" verdict form section, the foreperson signed the "Guilty" verdict form and confirmed to the trial court that the jury had unanimously found Appellant guilty. The argument has no support in the record. The foreperson signed to indicate a guilty verdict and confirmed that it was the jury's verdict, and nothing in the record contradicts that confirmation.[9]

We further note that to the extent the jury might have believed that the trial court's signature reflected the trial court's opinion that Appellant was not guilty, the jury ignored it, as it had been instructed to do. The charge stated,

> You are instructed that you are not to allow yourselves to be influenced in any degree whatsoever by what you may think or surmise the opinion of the Court to be. The Court has no right by any word or any act to indicate any opinion respecting any matter of fact involved in this case, nor to indicate any desire respecting its outcome. The Court has not intended to express any opinion upon any matter of fact in this case, and if you have observed anything which you have or may interpret as the Court's opinion upon any matter of fact in this case, you must wholly disregard it.

Nothing in the record indicates that the trial court's signature may have influenced the jury's verdict.

---

[9]We further note that, if the trial court signed the page before submitting it to the jury, the jury foreperson could have seen the space for the trial court's signature on the page and surmised that the trial court had simply signed in the wrong place.

Finally, Appellant asserts that the trial court erred by not allowing the State to request a poll. Appellant refers to the comment made by the trial court after asking if either side objected to its accepting the verdict:

> THE COURT: All right. Is there any reason why the Court should not accept this verdict?
>
> > [Defense attorney]: Not from the Defense, Judge.
> >
> > THE COURT: Obviously not from the State either.
> >
> > All right. That is the conclusion of [the jury's] portion of this.

The prosecutor did not object, nothing indicates that the prosecutor wanted the jury polled, and the State has not made that complaint on appeal. Because Appellant did not request a jury poll, she may not complain that one did not occur. *See* Tex. R. App. P. 33.1; *Wallace v. State*, No. 02-14-00427-CR, 2015 WL 5634247, at *2 (Tex. App.—Fort Worth Sept. 24, 2015, no pet.) (mem. op., not designated for publication).

Appellant was not harmed by the complained-of charge error. We therefore overrule Appellant's third issue.

## Conclusion

Having overruled Appellant's three issues, we affirm the trial court's judgment.

29

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: July 18, 2024

# Appendix

*Entered this, the 8th day of March, 2023.*

_____
LAURI RAGLAND, JUDGE PRESIDING

## VERDICT FORM

We, the Jury, find the Defendant, MIYUKI RYAN-POYDRAS, Guilty of the offense of Assault, as alleged in the Information.

▮▮▮▮▮▮▮▮▮▮▮▮

Presiding Juror

We, the Jury, find the Defendant, MIYUKI RYAN-POYDRAS, Not Guilty of the offense of Assault, as alleged in the Information.

_____
Presiding Juror

9

31